

AF Approval JH                                   Chief Approval CB for CK

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                      CASE NO. 6:23-cr- 173 - RBD - EJK

SERGEY KARPUSHKIN

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by
Roger B. Handberg, United States Attorney for the Middle District of Florida,
Margaret A. Moeser, Acting Chief of the Money Laundering and Asset
Recovery Section ("MLARS") of the Criminal Division of the United States
Department of Justice, and Jennifer Kennedy Gellie, Acting Chief of the
Counterintelligence and Export Control Section ("CES") of the National
Security Division of the United States Department of Justice, and the
defendant, SERGEY KARPUSHKIN, and the attorneys for the defendant,
Stephen G. Larson, Esq., Hilary Potashner, Esq., and David Edelstein, Esq.,
mutually agree as follows:

Defendant's Initials  Sk

## A. Particularized Terms

### 1. Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with Conspiracy to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371.

### 2. Maximum Penalties

Count One carries a maximum sentence of five years' imprisonment, a maximum fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

### 3. Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are as follows:

First:       two or more persons in some way agreed to try to accomplish a shared and unlawful plan to commit an offense against the United States, namely:

Defendant's Initials _SK_

2

      (a) to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705; and

      (b) to transport, transmit, and transfer a monetary instrument from a place outside the United States to a place within the United States or from a place within the United States to a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely IEEPA, in violation of 18 U.S.C. § 1956(a)(2)(A), as charged in the Information;

Second:    the defendant knew the unlawful purpose of the plan and willfully joined in it;

Third:    during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Information; and

Fourth:    the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

4.    Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida, MLARS, and CES (collectively, "the Offices") agree not to charge the defendant with committing any other federal criminal offenses known to the Offices at the time of the

3

Defendant's Initials  _SK_

execution of this agreement, related to the conduct giving rise to this plea agreement.

      6.    Guidelines Sentence

          Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

      7.    Adjusted Offense Level - Joint Recommendation

          Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's adjusted offense level be calculated as set forth below:

| Guideline | Description | Levels |
|---|---|---|
| USSG § 2M5.1<br>USSG § 2S1.1 | Base Offense | 26 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |

4

Defendant's Initials _S K_

| Total Adjusted Offense Level | 23 |

The parties understand that such a joint recommendation is not binding on the Court, and if not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty. The defendant reserves the right to seek a 2-point reduction in the total adjusted offense level pursuant to the impending U.S.S.G. § 4C1.1 (zero point offender).

8.    Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea

Defendant's Initials $\underline{\text{SK}}$

5

Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to move pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the recommendation of a downward adjustment of a third level for acceptance of responsibility rests solely with the Offices, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.

The assets to be forfeited specifically include the $4,723,625 in proceeds the defendant admits he obtained as the result of the conspiracy to violate IEEPA to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of this offense, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence.

Defendant's Initials  _SK_

6

Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the

United States is entitled to forfeit any other property of the defendant

(substitute assets), up to the amount of proceeds the defendant obtained, as the

result of the offense of conviction.  The defendant further consents to, and

agrees not to oppose, any motion for substitute assets filed by the United

States up to the amount of proceeds obtained from commission of the offense

and consents to the entry of the forfeiture order into the Treasury Offset

Program.  The defendant agrees that forfeiture of substitute assets as

authorized herein shall not be deemed an alteration of the defendant's

sentence.

The defendant additionally agrees that since the criminal

proceeds have been transferred to third parties and cannot be located by the

United States upon the exercise of due diligence, the preliminary and final

orders of forfeiture should authorize the United States Attorney's Office to

conduct discovery (including depositions, interrogatories, requests for

production of documents, and the issuance of subpoenas), pursuant to Rule

32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate,

and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory,

and procedural challenges (including direct appeal, habeas corpus, or any

Defendant's Initials _SK_                          7

other means) to any forfeiture carried out in accordance with this Plea

Agreement on any grounds, including that the forfeiture described herein

constitutes an excessive fine, was not properly noticed in the charging

instrument, addressed by the Court at the time of the guilty plea, announced at

sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in

the Factual Basis below provides a sufficient factual and statutory basis for the

forfeiture of the property sought by the government. Pursuant to Rule

32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will

satisfy the notice requirement and will be final as to the defendant at the time

it is entered. In the event the forfeiture is omitted from the judgment, the

defendant agrees that the forfeiture order may be incorporated into the written

judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and

locate all substitute assets and to transfer custody of such assets to the United

States before the defendant's sentencing. To that end, the defendant agrees to

make a full and complete disclosure of all assets over which defendant

exercises control, including all assets held by nominees, to execute any

documents requested by the United States to obtain from any other parties by

lawful means any records of assets owned by the defendant, and to consent to

Defendant's Initials _SK_

8

the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for

Defendant's Initials _S K_

9

acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

10.   Removal - Notification

The defendant has been advised and understands that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, the offenses to which defendant is pleading guilty may be a removable offense. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the district court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty

Defendant's Initials  S K

10

regardless of any immigration consequences that may result from the defendant's guilty plea, even if the consequence is the defendant's automatic removal from the United States following completion of the defendant's sentence.

**B.    Standard Terms and Conditions**

      1.    Restitution, Special Assessment and Fine

         The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, _shall_ order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

Defendant's Initials _SK_

11

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2.    *Supervised Release*

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the

Defendant's Initials  *S k*

12

background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    *Financial Disclosures*

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the Offices within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The

Defendant's Initials  $S \, \mathrel{\kern-0.2em \underline{\mathrel{\kern-0.2em\kern0.2em}}} $

13

defendant similarly agrees and authorizes the Offices to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the Offices to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.   Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected,

Defendant's Initials _SK_

14

defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

      The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

15

Defendant's Initials   <u>S K</u>

8.     Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida as well as the Money Laundering and Asset Recovery Section of the Criminal Division of the U.S. Department of Justice and the Counterintelligence and Export Controls Section of the National Security Division of the U.S. Department of Justice, and cannot bind other federal, state, or local prosecuting authorities, although the Offices will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.     Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.     Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's

16

Defendant's Initials  S k

understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

17

Defendant's Initials _SK_

11.  Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.  Entire Agreement

This plea agreement, including Exhibit A, constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

18

Defendant's Initials _SK_

13. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 29th day of August, 2023.

ROGER B. HANDBERG
United States Attorney

By: _____
Chauncey A. Bratt
Assistant United States Attorney

SERGEY KARPUSHKIN
Defendant

By: _____
Cherie L. Krigsman
Chief, MDFL National Security Section

Stephen G. Larson, Esq.
Attorney for Defendant

Hilary Potashner, Esq.
Attorney for Defendant

MARGARET A. MOESER
Acting Chief, MLARS
U.S. DOJ, Criminal Division

By: _____
Sean O'Dowd, Trial Attorney

JENNIFER KENNEDY GELLIE
Acting Chief, CES
U.S. DOJ, National Security Division

By: _____
Emma Ellenrieder, Trial Attorney

Defendant's Initials ___SK___

19

Sergey Karpushkin

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:23-cr-

SERGEY KARPUSHKIN

PERSONALIZATION OF ELEMENTS

First:     Did two or more persons in some way agree to try to
           accomplish a shared and unlawful plan to commit an
           offense against the United States, namely to violate the
           International Emergency Economic Powers Act
           ("IEEPA"), 50 U.S.C. § 1705, and to transport, transmit,
           and transfer a monetary instrument from a place outside
           the United States to a place within the United States or
           from a place within the United States to a place outside the
           United States with the intent promote the carrying on of a
           specified unlawful activity, namely IEEPA, in violation of
           18 U.S.C. § 1956(a)(2)(A), as charged in the Information?

Second:    Did you know the unlawful purpose of the plan and
           willfully join in it?

Third:     During the conspiracy, did one of the conspirators
           knowingly engage in at least one overt act as described in
           the Information?

Fourth:    Was the overt act committed at or about the time alleged
           and with the purpose of carrying out or accomplishing
           some object of the conspiracy?

Defendant's Initials  SK                    20

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:23-cr-

SERGEY KARPUSHKIN

## FACTUAL BASIS

### IEEPA and the Ukraine-/Russia-Related Sanctions Regulations

The International Emergency Economic Powers Act ("IEEPA")

provides the President of the United States with authority "to deal with any

unusual and extraordinary threat, which has its source in whole or in substantial

part outside the United States, to the national security, foreign policy, or

economy of the United States." Pursuant to that authority, the President may

declare a national emergency through executive orders that have the full force

and effect of law. Among other things, IEEPA empowers the President to

> investigate, block . . . regulate, . . . prevent or prohibit, any
> acquisition, holding, withholding, use, transfer, withdrawal,
> transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or
> transactions involving, any property in which any foreign country
> or a national thereof has any interest by any person, or with respect
> to any property, subject to the jurisdiction of the United States

and to "issue such regulations . . . as may be necessary for the exercise of the

authorities granted" by IEEPA. IEEPA further provides that it is a crime to

Defendant's Initials $S K$

21

willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA.

In March 2014, pursuant to IEEPA, the President issued Executive Orders 13660, 13661, and 13662 (the "Executive Orders") authorizing the Secretary of the Treasury to block all property and interests in property of persons involved in the Russian Federation military invasion of the Crimea region of Ukraine, including persons operating in the defense and related materiel sector of the Russian Federation.

Pursuant to the Executive Orders, the Secretary of the Treasury promulgated the Ukraine-/Russia-Related Sanctions Regulations (Title 31, Code of Federal Regulations, Part 589), which generally prohibit any U.S. person from conducting business with persons or entities on the U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons List ("SDN"), which is managed by the Treasury Department's Office of Foreign Assets Control ("OFAC"). Specifically, the Ukraine-/Russia-Related Sanctions Regulations state that:

> The prohibitions . . . of this section include prohibitions on the following transactions: (1) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to paragraph (a) of this section; and (2) The receipt of any contribution or provision of funds, goods, or services from any person whose property and interests in property are blocked pursuant to paragraph (a) of this section.

22

Defendant's Initials  SK

The regulations specify that "the term *person* means an individual or entity."

The Ukraine-/Russia-Related Sanctions Regulations incorporate by reference the prohibitions of the Executive Orders, which bar:

> (a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and (b) the receipt of any contribution or provision of funds, goods, or services from any such person.

The Executive Orders further prohibit any transaction that evades or avoids the prohibitions in the orders and any conspiracy to violate these prohibitions.

On July 30, 2015, OFAC designated Sergey Vitalievich Kurchenko ("Kurchenko") as an SDN and blocked his property and interests in property. In the absence of a license to the contrary, U.S. persons are prohibited from contributing funds, goods, or services to Kurchenko or for his benefit. Similarly, absent such a license, U.S. persons are prohibited from receiving any contribution of funds, goods, or services from Kurchenko. OFAC designated Kurchenko for being responsible for or complicit in misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine. On January 26, 2018, OFAC designated, *inter alia*, related company Kompaniya Gaz-Alyans, OOO ("Gaz-Alyans") for having acted or purported to act for or on behalf of, directly or indirectly, the so-called Donetsk People's Republic ("DPR") and the so-called Luhansk People's Republic ("LPR"), which are in

Defendant's Initials _SK_

23

the Donbass region of Ukraine. OFAC noted at the time that "Gaz-Alyans, OOO . . . is controlled by Sergey Kurchenko."

### Background and Total Value of Sanctioned Transactions
### for which Karpushkin is Responsible

Metalhouse, LLC was registered in the State of Florida as a Limited Liability Company on February 2, 2014, and listed its registered agent as John Unsalan, who also served as an Authorized Member for Metalhouse. Before Unsalan's arrest in April 2023, Metalhouse operated in the steel industry by trading and distributing raw steel-making materials globally.

Between 2018 and 2020, SERGEY KARPUSHKIN, both in his individual capacity, and using a company controlled by him named Commodity General Trading USA, LLC ("Cogentra USA"), which was registered in the State of Florida, willfully helped carry out and facilitate business transactions that Metalhouse engaged in with companies that KARPUSHKIN knew were owned and controlled by Sergey Kurchenko, an oligarch located in Russia who had been designated by OFAC at the time as a Specially Designated National. More specifically, KARPUSHKIN, Unsalan, and others conspired to orchestrate and carry out a scheme to violate IEEPA by willfully conducting monetary transactions with and for the benefit of Kurchenko and entities owned and controlled by Kurchenko and willfully receiving metal products from Kurchenko and entities owned and controlled by Kurchenko without first

Defendant's Initials _SK_

24

having applied for and received a license from OFAC. KARPUSHKIN and Unsalan both knew that an OFAC license was required and that they did not have such license to transact with Kurchenko and companies owned and controlled by Kurchenko. During the relevant period of on or about July 27, 2018, to on or about August 28, 2020, KARPUSHKIN, Unsalan, and Metalhouse engaged in transactions totaling $139,958,834.97 with Companies A and B below, entities that they knew were owned and controlled by Kurchenko.

### Companies A and B

One of these entities owned and controlled by Kurchenko with which KARPUSHKIN and Unsalan conducted business transactions was a business incorporated in Hong Kong ("Company A") that maintained a bank account in Saint Petersburg, Russia. Another entity owned and controlled by Kurchenko with which KARPUSHKIN and Unsalan conducted business transactions was a business incorporated in Cyprus ("Company B"). KARPUSHKIN and Unsalan both knew that Company A and Company B were owned and controlled by Kurchenko, whom both KARPUSHKIN and Unsalan also referred to as "Mr. K."

Defendant's Initials _SK_

25

**KARPUSHKIN and Unsalan Were Willfully Doing Business with
Company A and Company B, Despite Knowing that They Were Owned
and Controlled by Kurchenko**

In approximately January 2019, KARPUSHKIN, Unsalan, and others
known and unknown to the United States traveled to Moscow, Russia, and
participated in an in-person meeting with Sergey Kurchenko about the business
relationship and current balances of funds owed between Metalhouse, Unsalan,
and KARPUSHKIN, on the one hand, and Kurchenko's companies, including
Company A and Company B, on the other hand.

In or about August 2020, KARPUSHKIN emailed an individual with the
initials A.P. on an encrypted messaging service, explaining that
KARPUSHKIN was working with Unsalan, and that they were purchasing
goods through Company A from a "Mr. K," *i.e.*, Kurchenko, who owed them
at least $21 million:

> Regarding our conversation yesterday, the company from which I
> am working with Mr. K is called Metalhouse. The front man of
> the company is Mr. Can[1] Unsalan. We are partners in this project.
> Mr. K officially confirms there is an unpaid balance of 21 million
> dollars (See their official data further in the text). In fact it is a little
> more but I suggest starting with their figures. We have an
> agreement that they will be paying one million dollars to us
> monthly (see the document below). They have been violating the
> agreement for twelve months already. I need to understand if it is
> realistic to return part of it / everything and how much the services
> will cost.

---

[1] "Can" is Unsalan's middle name.

26

Defendant's Initials  S K

The words "front man" were in English while the rest of the message was in Russian. KARPUSHKIN then sent A.P. two documents, one of which was a September 2019 addendum to a contract between Company A and Metalhouse.

On or about this same date in August 2020, KARPUSHKIN sent via electronic message a copy of a May 22, 2020 letter from Metalhouse's General Manager and In-House Counsel to Company A with a carbon copy directed to "Sergey Vitalievich Kurchenko." The letter sought to reduce the amount Company A owed to Metalhouse under the same underlying contract.

By in or about February 2021, Company A's outstanding balance with Metalhouse, *i.e.*, Metalhouse's total payments to Company A minus the value of goods shipped by Company A, had reached $26 million. On or about February 27, 2021, Unsalan messaged a Russian national business associate, stating "I need your help because I have receivable from kurchrnko [sic] 26m$ and can't get anything do you know any one Strong in government to push him." Less than two weeks later, on or about March 11, 2021, Metalhouse forwarded to Company A personnel a table that showed Company A owing Metalhouse a balance of over $26 million.

Like Unsalan, KARPUSHKIN engaged in these transactions with Company A despite knowing that the ultimate beneficiary of these transactions was Kurchenko, who had been designated as an SDN. In a series of messages

Defendant's Initials ___S K___

27

sent to KARPUSHKIN by a business associate on or about December 29, 2019,
the associate provided a large amount of information regarding Kurchenko and
his business operations, including that Gaz-Alyans and Company A were
controlled by Kurchenko, and that Company A "exported the products."
KARPUSHKIN responded to the business associate's messages that "There is
nothing new here. Everyone who is aware of this knows," followed by "It's an
open secret so to speak."

### Between July 2019 and June 2020, Metalhouse Willfully Conducted over $43 Million in Deals with Kurchenko via Company B

In or about June and July of 2019, Metalhouse entered into two contracts
to buy metal products from Company B. Pursuant to these contracts (the
"Company B Contracts"), between in or about July 2019 and in or about
September 2019, Metalhouse paid Company B $10.53 million, and Company B
delivered to Metalhouse three shipments totaling 19,950 tons of steel billets at a
contracted price of $385 per ton, for a total value of $7.68 million. In or about
September 2019, Metalhouse and Company B entered into an addendum to the
Company B Contracts, signed by Unsalan in his capacity as Director of
Metalhouse, confirming that, as of September 12, 2019, Company B owed
Metalhouse a balance of $2.84 million under the contracts.

Between in or about September 2019 and in or about April 2020,
Metalhouse and Company B entered into at least fourteen purchase orders

Defendant's Initials _SK_

28

through which Metalhouse agreed to purchase an additional $34 million in metal products from Company B, including steel billets, pig iron, and wire rods. Pursuant to these purchase orders, between on or about September 19, 2019, and in or about June 2020, Metalhouse wired over $33.5 million to Company B. Company B, in turn, shipped a large number of metal products to Metalhouse. Unsalan and KARPUSHKIN made these payments and received these goods from Company B despite knowing that Company B was owned and controlled by Kurchenko, an SDN.

In a series of encrypted messages sent between in or about September 2020 and in or about July 2021, Unsalan and a person associated with Kurchenko who acted as Kurchenko's intermediary (the "Kurchenko Intermediary" or "A.K.") repeatedly referred to Kurchenko both by name and as "Mr. K." In a message on or about April 6, 2021, Unsalan stated that there were rumors "[t]hat Mr K [*i.e.*, Kurchenko] lost everything" and that "[w]e propose him to pay 1.9 million usd on behalf of [Company B] on April 19 as he promised . . . . Please let me know about payment for [Company B] . . . [a]s he promised." A.K. responded, "Ok, will ask Mr. K also about it." Similarly, on or about April 24, 2021, Unsalan messaged A.K. to explain that "I'm expecting money [from Kurchenko], we paid you money, you got money and you didn't deliver products[.] [T]here are two solutions: 1) You pay money back 2) you

Defendant's Initials  $S \, \vert\!\!\angle$                 29

load cargoes. Now you are delayed and we don't believe you can produce steel anymore, so we want option 1," *i.e.*, payment of the $1.9 million.

Similarly, in a September 2019 e-mail from Unsalan to KARPUSHKIN and others, Unsalan stated that "In the meeting with Mr. K we agreed for balance [$]19'400'000 including [Company B] + [Company A] VS METALHOUSE + [Company A] VS [another company owned and controlled by Unsalan] + DEMURRAGES." Elsewhere in the chain, in a message on which KARPUSHKIN was copied, Unsalan wrote "Long story short unless all numbers showing what we agreed with Mr. Kurchenko we will not sign anything."

## Additional KARPUSHKIN Emails and Texts Show that He Participated in Metalhouse's Transactions with Kurchenko-Controlled Companies

In March 2023, KARPUSHKIN arrived at Fort Lauderdale International Airport in Florida from Costa Rica, and U.S. Customs and Border Protection ("CBP") conducted a border search of KARPUSHKIN and the devices in his possession. The border search of a cell phone in KARPUSHKIN's possession revealed multiple communications showing that KARPUSHKIN helped facilitate Metalhouse's transactions with Kurchenko entities, including the following:

    a.    A conversation in or about October 2017 between KARPUSHKIN and V.B., a Russian business associate of Kurchenko who helped coordinate business deals for the Kurchenko-controlled entities,

Defendant's Initials  *SK*

30

discussing a business transaction involving a Turkish company and Metalhouse.

b.  An email from in or about November 2018 in which a representative for a Russian shipping agency emailed Unsalan, V.B., KARPUSHKIN, and two other individuals about an outstanding payment related to a Company A shipment. In the email, the shipping agency employee stated, "That's why my proposal from very early was to both the sides: METHOUSE [sic] and [Company A], actually Mr.John[2] [Unsalan] and [V.B.] to solve this matter directly and confirm to us WHO'LL COVER [to a third party] this particular expenses."

c.  A message from in or about August 2020 from KARPUSHKIN to an individual with the initials R.M., who was the majority shareholder and founder of a metal trading company. In the exchange, KARPUSHKIN stated, "My partner for Turkish biz (Can Unsalan) asks your phone number. He wants to talk to you about [Company A] shipments. Pretty much just to get an update how u do." R.M. responded by stating, "I want to avoid that he will use our name towards [Company A] and that he spoke to us." KARPUSHKIN then stated, "I work with him closely but Turks are Turks and I always watch what and how I am saying things."

During the March 2023 border inspection of KARPUSHKIN by CBP,

KARPUSHKIN initially falsely stated that he did not know V.B., but stated that

he knew that Kurchenko's secretary reported directly to V.B., and that he knew

this because the secretary was from his hometown. When CBP confronted

KARPUSHKIN about his text message exchanges with V.B. in his phone,

which spanned from 2017 to 2022, KARPUSHKIN stated that he was scared

so he had lied about not knowing V.B. KARPUSHKIN further stated that

---

[2] Spacing error in original.

Defendant's Initials  $\mathcal{SK}$

31

Kurchenko was not a good person and falsely stated that he did not do business with Kurchenko.

### Unsalan and KARPUSHKIN Jointly Participated in the Transactions with Kurchenko Entities and Shared in Metalhouse's Profits

Between approximately August 21, 2019, and approximately July 7, 2020, Metalhouse agreed to seven purchase orders with Company A and twenty-one purchase orders with Company B. The Company A purchase orders were worth an approximate total of $9.9 million, while the Company B purchase orders were worth an approximate total of $53.1 million. Unsalan signed each of the purchase orders, and KARPUSHKIN was included in emails pertaining to each of these orders.

For example, on or about September 17, 2019, a Company B representative emailed Unsalan and KARPUSHKIN regarding their purchase of 14,000 metric tons of steel billets from Company B, stating "Dear John / Sergey, Please find attached new PO [purchase order] for 14,000 MT of Steel Billets countersigned by us." This email attached a purchase order bearing signatures and stamps from both Metalhouse and Company B memorializing the transaction.

As another example, on or about November 12, 2019, a business representative sent a purchase order to both Unsalan and KARPUSHKIN, in

Defendant's Initials  SK

32

which Metalhouse had agreed to purchase $1,560,000 worth of wire rods from Company A.

In addition, on or about December 28, 2019, KARPUSHKIN sent an email to Company B representatives, copying Unsalan, among others, in which KARPUSHKIN stated, "[a]s agreed earlier please find attached draft of the new PO [purchase order] for 10000 mt [metric tons] of pig iron out of January production. . . . If you have any remarks please let us know." The email attached a purchase order proposing that Company B sell $2,900,000 worth of pig iron to Metalhouse.

From in or about August 2017 to in or about January 2020, Unsalan and KARPUSHKIN sent each other several "profit sharing" spreadsheets. For example, in an August 2017 email titled "volgobalt 214 profit-," KARPUSHKIN told Unsalan, "I see our (you + me) profit, which is 50% from total net profit in amount of 28,803.26 USD, right? I assume we need to share 2846.38 mt * 5 USD/t = 14,231.9 USD with the guys and only balance amount of 14,571 .36 is actually our (you + me) real profit."

Similarly, in or about October 2019, Unsalan sent to KARPUSHKIN a spreadsheet titled "PROFIT CALCULATIONS / SERGEY K[ARPUSHKIN] – METALHOUSE." The first workbook within the spreadsheet, labeled "TOTALS," had a chart with three columns: "Vessel," "Product" and "Total."

Defendant's Initials _SK_

33

The "Total" column listed the dollar value of each shipment. The bottom of the spreadsheet then listed a total dollar value which appeared to be the total profit to be shared by KARPUSHKIN, Unsalan, and another co-conspirator. The second workbook within the spreadsheet, labeled with the name of a different trading company associated with Kurchenko, had a similar three-column chart. Below the chart, the spreadsheet stated the following:

| Outstanding Credit in | $ (7,045,000.00) |
|---|---|
| 33% SERGEY KARPUSHKIN | $ (2,324,850.00) |
| 33% UNSALAN | $ (2,324,850.00) |
| 33% | $ (2,324,850.00) |

### KARPUSHKIN was Knowledgeable of the U.S. Sanctions Regime

Records from the March 2023 CBP border search of the phone in KARPUSHKIN's possession indicate that KARPUSHKIN, who has lived in the United States since approximately 2004 and has engaged in international metal transactions for many years, was knowledgeable about U.S. sanctions laws. He engaged in a number of conversations with others related to the U.S. sanctions legal regime. For example, the U.S. Department of the Treasury maintains a publicly accessible OFAC search tool to enable businesses and private parties to search the OFAC sanctions list to identity sanctioned and designated entities with which they cannot do business. On or about August 30, 2017, KARPUSHKIN emailed a link to this OFAC search tool to an associate.

34

Defendant's Initials  $ \mathcal{S} \mathsf{K} $

In or about August 2021, a business associate sent to KARPUSHKIN via electronic message a copy of Executive Order 14038 pertaining to OFAC restrictions on Belarus. In the message, the business associate sought KARPUSHKIN's perspective on this OFAC sanctions issue, stating, "You know more about the situation in Belarus than I do."

Unsalan and KARPUSHKIN expressly discussed generating false and misleading certificates for sanctioned goods expropriated by the Russians from Ukraine that would suggest that the goods, in fact, originated in Russia. Specifically, on or about July 15, 2017, Unsalan forwarded to KARPUSHKIN an e-mail inquiry from a bank indicating that a letter of credit would likely be issued for a particular transaction so long as it did not involve sanctioned goods ("Hi John . . . I need to make you aware that any [letters of credit] involving shipments from or to Russia must be reviewed and approved by our Trade Controls area . . . I do not anticipate any problems as long as the transaction does not violate any current sanctions."). Unsalan further indicated to KARPUSHKIN that to bypass this issue, the supplier of the goods would need to doctor the certificates for the goods:

> We will declare the goods are made in Russia. Which mill will issue the MTC ["mill test certificate"] in case bank is asking for it? If it's Yankiyeve Iron and Steel Works Public Joint Stock Company (PJSC) – [it] means showing Makeyvka, do they have alternative way to provide MTC printed out by another mill in Russia.

Defendant's Initials  _SK_

35

Yanikiyeve (Yenakiyeve) and Makeyvka (Makiivka) are both located in the sanctioned Donetsk region of Ukraine. KARPUSHKIN responded by stating that if this was for wire rod coils, he would need to "ask the guys," referencing the generation of false mill test certificates.

At all times relevant to the Information, KARPUSHKIN and Unsalan knew that no individual or entity had obtained the necessary license or authorization from OFAC to engage in the above transactions with Kurchenko and entities owned and controlled by Kurchenko.

### Karpushkin and His Company, Cogentra USA, Received $4,723,625 in Proceeds from the Offense

Pursuant to the conspiracy, Karpushkin and the company that he controlled throughout the conspiracy, Cogentra USA, received a total of $4,723,625 in proceeds as a result of the unlawful transactions with Company A and Company B. Specifically:

- between in or about August 2018 and in or about January 2019, Cogentra USA received $634,625 from a company, C.I., which Cogentra USA was assisting in obtaining the sanctioned goods from Company A on behalf of Metalhouse;

- between in or about March 2019 and in or about February 2020, Cogentra USA and Karpushkin received a total of $589,000 in wire transfers from Metalhouse; and

- between in or about 2019 and in or about 2021, Karpushkin and Cogentra USA received approximately $3,500,000 in wire

Defendant's Initials  $S \, \kappa$

36

transfers from another company or companies engaged in the sanctions violations with Company A and/or Company B.

Defendant's Initials  S K

37